The third case on the docket is 2-18-0678, Mazzetta Company, LLC, plaintiff's account, v. Stevens, Felsenthal, and Fortune International, LLC, defendants' athletes, arguing on behalf of the plaintiff's account, Mr. Steven H. Dixonson, arguing on behalf of the defendants' athletes, Mr. Philip Sean Boyer. Mr. Dixonson. Thank you. Good morning, Your Honors. May it please the Court. My name is Steven Dixonson, and along with my associate, Katie Welch, we're appearing on behalf of the plaintiff in this matter, Mazzetta Company. Your Honors, the trial court in this matter dismissed the plaintiff's complaint that alleged three counts that are all founded upon a non-competition, non-solicitation confidentiality agreement entered into between the plaintiff and Mr. Felsenthal, who was employed by Mazzetta Corporation two different periods of time. But in connection with this case, he was employed by Mazzetta from June 24, 2013, to October 6, 2017, almost four and a half years. Your Honors, the one conclusion... When he was first employed, was there a non-compete? Yes, there was, Your Honor. Was it the same one, or the same... It was a different non-compete, Justice Hutchinson. But during both periods of time, as the record reflects, there was a non-competition agreement, or I call it non-competition, non-competition, non-solicitation... Rejected covenant, whatever. Yes, Judge. The one conclusion that the trial court reached in granting the defendant's motion, without any analysis, is that the trial court stated she has never seen an employment covenant more draconian than those to which Mr. Felsenthal agreed and signed. Your Honor, it's not clear to me why the trial court appeared to have such hostility towards this particular agreement. But there was clearly that issue that the trial court had. Because if you look at the ruling, the transcript of the court's ruling, and there is no written ruling in this case, just an oral ruling on the bench. The judge didn't apply any of the standards that the Supreme Court articulated in the reliable fire case. Would you agree that our review is de novo? Absolutely. And that we can perform the trial court on any basis supported by the record, including the contract itself? Yes, Judge. The agreement itself. So tell us how this particular agreement is no greater than required for a legitimate business interest of Mazzetta. Because it basically covers the entire country and every job related to the fish industry. The seafood industry. Well, it is more limited than that, Justice Burkett. How so? Well, it's more limited because it specifically is tied to the work that Mr. Feldenstahl did for Mazzetta while he was at Mazzetta. And I'll refer to a couple of the specific provisions. But I think it's very. Well, wait. There's one, though, that says where Mazzetta currently does business in, that's pretty definable. Let's see. Did any business while he was employed there? Or plans to do business in. That isn't even definable. Well, Justice Hutchinson, that provision relates to, and it says it as part of that provision. It says where Mazzetta developed plans to do business while Mr. Feldenstahl was an employee at Mazzetta. So, for example, if Mr. Feldenstahl is working with Mazzetta on a plan to go into a particular market area, they do research, they gather information about that market area, that's what that provision relates to. It does by no means relate to, after the fact, Mazzetta can come up with an argument, well, we always wanted to do business in Chile, or we always wanted to do business in Nova Scotia, whatever it might be. But if you're working with Chile, it's North America. That's true. Well, it's the United States and provinces in North America. Right. Yes. So, in answer to your question, Justice, it's not just an open-ended, anywhere where we might say we plan to do business. It relates to a plan that existed while Mr. Feldenstahl was an employee at Mazzetta. That's how that provision is drafted. Well, how many states does Mazzetta do business in? Mazzetta does business all over the country. So, the defendant would be barred from doing any work in the seafood industry in the entire United States for 18 months. Well, I wouldn't. Is that a fair reading? No, I think it's a little too expansive, Your Honor. Well, how is it not expansive? When I looked at it, maybe I'm not as precise in my reading of it, but it looked pretty draconian to me as well. Well, it's not that expansive. It's not, as Your Honor is suggesting, because what that provision says is it defines competing products or services. And that provision is tailored and limited to products or services substantially the same as Mazzetta's products or services during the time of Feldenstahl's employment. So, there are two points there. First of all, it has to be a product or service that is substantially the same as the very product and services that Mr. Feldenstahl is selling for Mazzetta. And, two, it has to be a product or service that Mazzetta was selling at the time that Mr. Feldenstahl was employed. So, it's not at all atypical of restrictive covenants you see. It just so happens that this is a company that sells those specific products or services. All types of seafood? Well, it's not all types of seafood. Okay. What's excluded? It's whatever Mr. — what's excluded is what Mr. Feldenstahl did not sell for Mazzetta. That's how the contract's written. Isn't that — doesn't the case law really frown on really basically, you know, preventing competition per se? Isn't that what the case law tells us about law-abiding clauses? And doesn't this clause basically do that? To answer the first part of your question, there certainly is case law that stands for the proposition that restrictive covenants are scrutinized because they're restraints on trade. Certainly. But there is also case law, and I believe the C.G. Caster case is an example of it, where courts recognize that there is a utility, a social and business utility, in having restrictive covenants. Because in a case, and this case is the best example, where Mazzetta has expended substantial time, money, and effort to teach this business the products that Mazzetta sells, to teach those to Mr. Feldenstahl, both during the original period and during the second period of his employment, to introduce them to its customers and its suppliers, to take him to its warehouses to show him how, you know, what the process is from harvesting the product to processing it, to bringing it in, to distributing it, and so on and so forth. The cases say that a company has a legitimate business interest in protecting that investment. And that's what's going on here. And I would note, you know, we do have a situation here where we had two different employment periods. After the first employment period, Mr. Feldenstahl, who I'll mention as I state in the brief, he wasn't a frozen seafood salesman, to use that term. Again, I don't mean to use it broadly. He didn't do that. He worked for a Feather and Down Company before he was a salesman in 2007, I believe it was, for Mazzetta. He was a salesman. He's very good at being a salesman. We taught him the business. When he left Mazzetta, he's- The first time. The first time. Well, actually, well, yes, the first time. He did claim he was leaving for a different reason the second time. But what he, in fact, did when he left the first time is he said, I'm going to go into business with my father-in-law, who runs this insurance brokerage company. He went and he got his brokerage license. So this is an individual who sells many different types of products and services. His life, unlike what we saw in Assured Partners, his life is not- his professional life is not a professional life that's focused on one industry. He's a salesman. He left Mazzetta. He went to work for his father-in-law in the insurance business. He was going to get a piece of the business. Turns out he didn't like that, so he came back to Mazzetta. And we continued to teach him the business, to enmesh him in our business, to spend time, money, and effort, and importantly, to give him access to all of our confidential information, information that's not publicly available, information that we gather and make available in a secure place for all of our employees to access so they know what the margins are, know what kind of leeway they have to sell to customers with differing margins. Isn't a lot of that information publicly available? Not this type of information. Certainly there's information available, and the record hasn't been developed on this. And here's another point that was raised. There's no allegation that the customers, that there were exclusive relationships, that the customers bought from several different companies on any given day. Is that accurate? Well, I think what the record is. Your customers were not exclusive. You didn't have permanent customer relationships. In other words, if they're going to get a better price somewhere, they're going to go there, right? Well, we do have customer relationships. Whether they are near permanent relationships where they only deal with them, I suspect the evidence will say, no, they buy from different sources. I'm talking about what was pled, not just what is argued. We didn't plead evidentiary facts in our complaint, Your Honor, and nor do I think we're required to plead evidentiary facts. One of the issues that stands out so prominently here is this complaint was dismissed on a motion to dismiss. Despite the fact that courts almost unanimously, I haven't found a court that hasn't said it, has said these are fact-intensive questions and the parties must be given the opportunity to develop the facts. We weren't given that opportunity here. A motion to dismiss was granted before we were able to do anything. And, again, on a basis that we think was not correct under the reliable case and under the law. But did the, in this particular case, as opposed to concerning herself with facts, the trial court looked specifically at the non-compete clause and made her determination on the non-compete clause and the restrictive nature of that clause, correct? So why would she need to go on and look at the facts of the case? Isn't that a question of law? Not in this case, Your Honor. And the reason is, first of all, I don't believe, I would submit to Your Honors, that the trial court in this case did not analyze the provisions of the agreement. The trial court in this case made no, said not one word about a specific provision that the court thought was too broad. And did not address, for example, how the time period for these covenants is limited to 18 months, a very short period when you look at some of the cases that involve two years or more. That here there was consideration where this isn't a non-solicitation or a restrictive covenant that was entered into while the guy was already an employee of the company. This is at the beginning of his employment as a condition to him being employed by the company. That the restrictive covenants are limited to customers and suppliers that this defendant worked with while he was at Mozetta. Not just any customer of Mozetta. A customer that he worked with or obtained confidential information regarding. It's limited to products and services. And I don't want to repeat myself when Justice Burkett raised this issue. But it's limited to products and services that he worked with while he was at Mozetta. So my answer to your question, Justice Shostak, is I don't believe the court considered the specific provisions of the agreement. Because I think it's difficult to reconcile this broad statement that the agreement is draconian. When there are those specific limitations built into the agreement. The second part of my answer to your question, Justice Shostak, is that there has to be a factual analysis. We have to be allowed to develop the facts relating to exactly what Mr. Feldenstahl did while he was at Mozetta. And we submit that those facts are going to demonstrate in detail all of the confidential information he had access to. All of the customers that he approached. And of course we don't know because we were shut off when the motion to dismiss was granted. Of course we don't know what customers he went after. However, as we do allege in the complaint. You mean he went after in his new place? Yes, unfortunately. What we do allege in the complaint, however, is that he was specifically hired away from Mozetta by Fortune International through another former employee of Mozetta. For the purpose of competing with Mozetta as to these products and as to these customers. We've alleged those facts. We've alleged the ultimate facts that were required to allege. And I submit we're entitled to conduct discovery as to those facts. Well, as I read this agreement, covenant, whatever we're going to call it. It appears to prohibit him from soliciting anybody he spoke to while employed at Mozetta. Even if they chose not to do business with Mozetta. Is that accurate? It prohibits him. If he talked to somebody. And that could be something is. I mean, that's another issue. Is it hello? A talk? Hi, how are you today? Fine. That's a conversation. Well, Your Honor, I see your point. I don't think the provision should be read that broadly. The provision, the non-solation. Well, it's a question of how it's written. I'm saying, isn't it written that broadly? It's written to prevent him from dealing with customers or suppliers. And I'm trying to find the language that he dealt with while he was an employee at Mozetta. Even if they didn't become a customer of Mozetta is what I'm saying. And I don't see anything in there that says, okay. Well, Your Honor, what I was. That doesn't apply to customers of Mozetta. That doesn't apply to people who did not become customers. It's people. It refers to people he solicited but did not become customers. Well, it doesn't say people that didn't become customers. It says. It says regardless of the reason for termination, solicitor call or attempt to solicitor call or perform services for any supplier or customer. That means someone who is, in fact, a supplier or customer of Mozetta. And it also refers to any affiliate of the supplier or customer with whom, A, with whom the employee's service sold or solicited on the company's behalf during his or her employment, or, B, with whom the employee had contact on the company's behalf during his employment. So it means that it's a customer that he's either working with or he had discussions with about providing products or services on behalf of the company. It's not somebody that he just called to say, hello, Mike, like in the. Okay. I get that. But if he calls them and says, you know, I work for Mozetta. I wonder if you'd be interested in our services. And they say, no, thank you. It appears that that would also be a prohibited contact. Well, Your Honor, I would submit to the court that that's too broad of a reading of the language. The language clearly contemplates an entity or person who is a customer or who is solicited to become a customer. In other words, you're exchanging information about prices, margins, delivery schedules, harvesting, so on and so forth. Does it say that? Well, I think it's ambiguous, Judge, because all it says in that regard under subsection B of paragraph 2 is it says, with whom the employee had contact on the company's behalf during his employment. That, I would say, to be fair, is a bit ambiguous. And I suppose a very strict reading could say, even if you called this person to say, you know, hello, that would be covered here. I think that's too broad of a reading. And I think that with this type of ambiguity, I think that's an unfair reading of this. It's talking about customers with whom confidential information was exchanged on behalf of Mozzetta to try and get Mozzetta's business. That's how I submit that provision should be read. But clearly under subsection A, it's limited to customers that he sold to, suppliers that he bought from. It's very tailored in that regard. And I would submit to the Court that subsection B is an ambiguous provision in that regard. Do you see that the case law in this State and throughout the country tends to steer away from noncompetent clauses? Or do you think it's going more to noncompetent clauses? Your Honor, the way I read the law, and I'm referring specifically to the Reliable Fire Case, is the Illinois Supreme Court kind of pulled us back to say, stop applying these strict, rigid standards. You have to apply a broader standard. And in that regard, I think what the Illinois Supreme Court instructs is to, I don't want to say broaden restrictive covenants, but at least to say, let's look at what the real interest here is that needs to be protected, a legitimate interest. We spent four and a half years during the second go-around teaching this guy our business, sharing our confidential information with him so that he can construct prices that would get customers to come to us, get suppliers to sell to us. That has a value to this company. And it's not publicly available information. It's something that's kept highly confidential in a locked facility where you need a fob to get in the door. It's on a software system called CSOFT, which you need a password to get into. This is confidential information. And under those circumstances, among a myriad of other facts that we need to be given a chance to develop in discovery, I think the Supreme Court is telling us, let's have discovery, give the parties the opportunity to develop the evidence, and then decide. Develop the evidence. You mean the evidence that Mr. Felsenthal is in fact utilizing that information that is sacred to your company in soliciting others? That's a part of it, yes. Yes, that first to establish exactly what he had contact with. I'll give you another example. As you know, the defendant submitted an affidavit of Mr. Felsenthal. Right, right. As did someone in your company. And Mr. Mazzetta responded with an affidavit. And as part of that affidavit, we know that Mr. Felsenthal had taken his laptop computer to the files in the locked facility at Mazzetta, and he was working with the files at the same time that he was working on his laptop. We haven't been able to find out what he was doing or what he accessed or what he downloaded. We need the opportunity to be able to develop that evidence as part of our discovery in this case. The judge in the trial court just terminated the case without that kind of factual information that in all of these cases parties are given a chance to develop. Going back for a moment, it's related, but to something you said, Justice Hutchinson, in the Capstone case that Your Honor offered, in that case, it was an employee who just was alleged to have conveyed his contact information to a customer, and you found, the court found, that that's not sufficient for a TRO, a very high standard TRO. Yet the court said, we're not making a decision based on the legitimate business interest of the company. We're not making a decision that there isn't a legitimate claim here. We're sending it back for discovery and for trial on that. We're just not granting a TRO. But the problem I guess I'm seeing with this one, there was something specific there, but with this one, in order to accomplish your purpose, to get him to stop this, you first have to allege the existence of a valid and enforceable contract between Mazzetta and Felsenthal. Absolutely. And there are four other going as far down as damages. But there's an and. It's not you have to do this or that. It's you have to do all of these things. And if we can't get past the first part, whether there is a valid and enforceable contract, by its terms, by its four corners, what's left? Why do we have to go beyond that? Well, my answer, Your Honor, is that I think we have alleged that. We've alleged an agreement where if the court looks at the specific non-compete language, non-solicitation language, confidentiality language, it's tailored language that applies for a limited period of time, 18 months, that's tailored. It applies only to the period of time the information is employed. Mr. Felsenthal came while he was an employee at Mazzetta. And it only applies to customers, vendors that he worked with while he was at Mazzetta. So I think we do. Well, I submit that we do. I don't mean to give my opinion, which doesn't count for anything. Oh, it does. But I submit to the court that those provisions amply satisfy what's required. Look at the reliable fire case. Very similar situation. We have people who were in the business of selling and installing fire suppression equipment. This is the Supreme Court case. Very similar provisions, non-compete, don't go to a customer you worked with while you were working with the plaintiff employer. And that's exactly what they did. They were alleged to have done. And the Supreme Court reversed both the trial court and the appellate court and said, these plaintiffs should be given the opportunity to do that. And focused on, these are fact-intensive questions. Let the evidence develop that support allegations that these tailored provisions of the non-compete agreement or restrictive covenants that they were, in fact, violated. Instead, the trial court pulled the rug out from under the plaintiff and said, you can't even pursue evidence to support what I submit are properly pled allegations in the complaint. We clearly survived a 2615 motion on all of the claims. And for the reasons set forth in our brief, and I won't reiterate what we said in our brief, but even under 2619, even as you review this agreement, as you're empowered to do de novo as a matter of law, I submit that you should find that this agreement is tailored enough to at least allow the parties to develop the evidence in this case to see what was breached, to see what was done by this defendant. I submit we have a right to do that. If it's that Mr. Felsenfeld just mailed his business card to Walmart or Costco or whomever, then that's not evidence of a breach of this agreement, the non-solicitation, Justice Burkett, what you were focusing on a minute ago, just sending a business card. That's not what we're saying. He was hired to compete with Mazetta to develop their importing of frozen seafood product that Mazetta imports, harvests and imports, the same product and services that Mazetta imports and sells and all the other myriad of things that we outlined in our brief. And after 18 months, he would have been free to solicit those customers. Yes. So the damage done to the company you're alleging was during that 18-month period that has now expired, correct? Well, we haven't gotten to that phase of the case, but I would answer that question affirmatively, Justice. Theoretically, the 18 months has gone by now. Well, it has, but I would also explore the position and reserve the ability to present the position that during the period of time while this defendant was breaching the contract, it doesn't count against the 18 months. So the 18 months would start anew? From the time period that this Court enforces that contract, yes, or the trial court. You know, I know you say that, well, the Supreme Court case that we talked about, it has set out a three-pronged test, one of those tests being undue hardship on the employee. And I know you're saying that, well, he could have gone into any other sales business, so this was not an undue hardship on him. That's right. Do the cases look at that undue hardship? Do they look at just the language? Or do they look at the undue hardship and say, oh, well, this guy can do many other things. He doesn't have to worry about this. Well, I'll be candid. I haven't found many cases that factually analyze that provision, other than what the Supreme Court said in Reliable, which is it's a fact-intensive analysis as to whether each of these three posts, these three tests are met. Right. We have beauty shop cases and cases where you're really specific and you're not going to be in sales or something else. Well, right. But the Assurance Partners case is a case where the Court said that this defendant here was in the wholesale insurance brokerage business before he went to work for the plaintiff employer, and the plaintiff employer is trying to enforce a restrictive covenant that says you can't sell any wholesale insurance business, even though that employer only dealt with that particular type of insurance. I don't remember the acronym, but I think it's LT or something like the lawyer's professional liability. Right. And the Court said that's too broad because you didn't do this work and also the Court looked at the customers or clients that Assurance Partners was using and the restrictive covenant that was found defective in that case tried to fine him for customers or clients that he never had any contact with. There was a list that was a part of that agreement, and these customers were not a part of that list. So, yes, to answer your question, I think it is a fact analysis that has to be undertaken, and in this case, we've even alleged facts, and there are facts that are included in Mr. Mazzetta's affidavit that when this defendant, Mr. Felgenfall, told us in September of 2018 that he was going to leave, I think I have to be right, that he was going to leave, he said, don't worry, I have many offers. I'm thinking of going back with my father-in-law in the insurance business. He's going to give me an ownership position. Mr. Mazzetta said, you know, we have this restrictive covenant that you shouldn't go into the same business that we're in, and he said, I understand, I have many other offers in the food business and otherwise. So I think what facts are alleged, and we believe we can support with evidence, are facts that demonstrate that this individual is a good salesman. He could do just about anything he has in his career, sold a lot of different things, and there's no undue hardship by preventing him from competing with Mazzetta on Mazzetta's products, Mazzetta's services, with customers that he worked with while he was at Mazzetta. One more thing I want to make sure I have a chance to highlight before my time is up, and that is in this case, like in C.G. Castro, we have a sophisticated individual who agreed to a provision that said these are reasonable restrictions and the minimum required to protect Mazzetta's legitimate business interests. If this court is going to do this. Again, your time is up, but what is the legitimate business interest? If they're not exclusive customers or near permanent relationships, what's the legitimate business interest? The legitimate business interest is all of the confidential information that was taught to this person while he was at Mazzetta so he would know how to construct an order, construct margin, figure out how to manipulate harvesting. That's true of almost any profession. A bricklayer learns how to lay brick. Well, it's more than learning how to lay brick, Justice Burkett. It's learning the specifics about margin, about price, how to deal with the suppliers and so forth that you use to your competitive advantage. The question is, your comments apply to several different businesses. It's not exclusive to the seafood industry. What I'm trying to convey in my answer, Justice, is that I don't think that the specifics about that, what you use to design your offers and your sales orders, those are not publicly available information. It's not something that any company would do. And I would just point out, and Em was saying, if it were something that anybody could do, they wouldn't have used a former Mazzetta employee to entice this guy, Feltzenfall, to leave Mazzetta to come and start their competitive business against Mazzetta. And I apologize. I didn't hear you. I didn't hear it either. I got a nod. It must have gone off my hearing a bit. Thank you. Excellent argument. Thank you, Justice. You'll have time for rebuttal. I even tried to keep track on my watch. I guess I didn't like it. It's okay. We were interested, so we do that sometimes. Yes. Mr. Wood. Thank you, Your Honor. May it please the Court. Counsel. My name is Sean Wood, and I represent the defendant, Stephen Feltzenfall, in Fortune International. The Surrey Court correctly determined this case should be dismissed. Well, the Court was pretty specific in what she said, but what did she rely on? She relied, first and foremost, on looking at the contract itself. And as you all have outlined in the case law explains, first and foremost, anyone attempting to enforce a restrictive covenant has to establish that it's no broader than necessary to protect a legitimate business interest. And here, you're talking about a provision that would prevent Mr. Feltzenfall from any employment in any position for any competitor located anywhere in North America. That's why she called it Dracovia, because that's way too broad. And assured partners and Cambridge Engineering and countless other cases explain, you can't do that. Well, the argument is that the contract should be read to refer to customers and not just anyone. Well, that's the non-solicitation, I think. But when we start with the non-compete and why that's just not enforceable from the get-go, one thing I didn't think I'd have to address is just the language of this that is that broad. In other words, the type of limitations and restrictions that were being described a moment ago aren't here. I mean, this goes to prohibiting Mr. Feltzenfall from directly or indirectly engaging in any business with any competing organization which does business anywhere in the territory. So it's not limited to particular customers. It's not listed to people that necessarily even bought. They use the word in that once you get to the non-solicitation, who had contact with Mr. Feltzenfall. That's the problem. It's contact with. So these people didn't even have to buy from Mozetta ever. They might have been entities that have never been a customer of Mozetta Company. They're strictly people who he spoke with once or had any contact with. And that's the first problem. The second is that it says, or attempt to solicit or call. These are the types of provisions that the case law explains. It's excessive. It's unreasonable. It's unenforceable. Now, if you go down, if you keep reading, you get to a phrase, with whom the employee service sold to or solicited on the company's behalf. But that's down farther. That's like four or five lines, maybe even a sentence. It's an independent sentence. And it says solicited, I think, which just means I tried to sell to you. And the attempt to sell broads it even further. But shouldn't Mozetta have the opportunity to do some discovery and perhaps make a determination that may be more to your benefit that, in fact, he isn't dealing with companies that they had worked with before or that he had solicited, et cetera, et cetera? I mean, why was this judge not premature in granting this notion? Okay. From the get-go, we can all agree that if you're going to force every employee out there to spend tens if not hundreds of thousands of dollars defending themselves in litigation on the possibility that they might have done something wrong on a facially overbroad and unenforceable restrictive covenant, it can't work that way. Not only are restrictive covenants held to a more challenging and rigid standard when courts are looking to apply them because they prevent people from earning a livelihood in their profession and courts scrutinize them very carefully, but in any case, a plaintiff has to have a good faith basis to file a lawsuit to begin with. You don't get to say, I might have a case. I need a discovery to plead my case in the first instance. That can't be how it works. You have to have some investigation. And time and time again, we've heard comments in the transcript of the Circuit Court of Proceedings where it was pointed out to counsel from Mozetta that you do not allege anywhere that you conducted any type of reasonable pre-file investigation to suggest that Mr. Felsenthal took anything, downloaded anything, used anything, disclosed anything. You've gotten nothing. My firm does these type of cases on both sides all the time. There are forensic studies you can do in a computer age very, very easily to say whether someone downloaded something. You don't shoot first and ask questions later and say, well, they might have downloaded something. I haven't done any investigation on my own computers. That's not a valid lawsuit. Well, I think counsel said here today, in particular, he took Mr. Felsenthal took his computer into the locked room. We don't know what he was doing there. Well, if you take a personal computer in there, doesn't that indicate something? I didn't see anything about a personal computer. I think that what was drilled down on, from my understanding of the transcript and the affidavit, was simply that they're talking about the process of logging on at work every day when you log on at work. That's all they're talking about. That's how deficient this was because one thing we brought up from the very beginning was we actually put their cease and desist letter into the record in the underlying case because what we tried to explain is when we received that letter, it was like air. There was nothing there. They quoted some provisions that were invalid on their face and then asked us to disprove whether or not he had done anything improper. Without any basis to say, usually somebody says, you're talking to these three customers. We know that you have this information because we've heard this. There was no valid basis. It was almost like, let's just slow somebody down and be anti-competitive through this adult lawsuit. Even the timing of it. It kind of took months after he left to kind of throw in a complaint. No motion for preliminary injunction. No TRO. No motion to expedite discovery. No discovery was served. No particular discovery was identified that would have allowed counsel to say, you know like in a 1A1B affidavit when somebody has to say, here's what I don't know and don't have access to and here's what I need to know. There's discovery that happens once you see an answer. There isn't an answer here. You want to see what's at issue. Yes, but there's two aspects to that. We see it quite often in non-compete cases that somebody files either a TRO or a TRO combined with a motion for preliminary injunction and seeks expedited discovery. I think it's extremely telling when you see somebody not do this. And I think it's even more telling when they ask for multiple extensions. To answer motions to dismiss, never ask for any, never submit a 1A1B affidavit to say, here's what I would need to know to respond to the 2619. Nobody ever did that in the underlying case. I respectfully submit that's waived. But if it's not waived procedurally, it's at least very persuasive and telling that there was no discovery that was going to change the language of these provisions. They don't contain the type of narrow and defined terms that the court held in reliable fire could potentially be something that they wanted to hear more in the totality of the facts. These provisions aren't changing. And there was nothing, you sort of have it on both sides. You have these draconian provisions which are unenforceable and unreasonable on their face by any applied measure of the case law, combined with the absence of any specifics as to customers talked to, information used, any type of trade secret, nothing of the kind. And so I think those are the reasons why it wasn't even a close call that this complaint could not survive a 2615 challenge and the arguments we made on the 2619 challenge. Likewise, when they submitted an affidavit, they didn't deny the fact that these are not near-permanent customer relationships. This is wholesale seafood. The restaurants might have five or six suppliers on any given month, week, or day. There's no master supplier agreements anybody has pointed to that are near-permanent customer relationships where, you know, Gibson says I'm only going to buy from these folks for the next six years or two years or whatever it is, nothing of the kind. They even explain that pricing changes by the week, if not day, and that the customers are what you look up in the phone book because it's all the restaurants that they're selling to. And none of them buy exclusively. They all work with everybody. Is the issue more not with who they're selling to but who they're buying from? Isn't that where the trade secret, if you will, comes in? Your Honor, I think that I'm not aware of many cases that have ever said that the suppliers because the suppliers that are out there, unless they're talking about exclusivity agreements with their particular supplier that says here's a fish that nobody else can get, that people will only buy sea bass from that part of the world from this supplier, but there's no discussion of that whatsoever. There's no proof of that, no allocation specific in the complaint. And one thing that's important that wasn't brought up during the prior argument is at the end of going through all these details, a certain court was asked by plaintiff's counsel, I would like leave to amend my complaint. And plaintiff was given leave to amend that deficient complaint. And the comment only was if you think you can amend this complaint in conformity with your Rule 137 obligations, go ahead, I'll give you 30 days. And what happened? No amended complaint was filed at all. No attempt to cure the deficiency that had been identified. No attempt to put all these things they're trying to throw into the mix kind of vaguely. We pointed out very directly this is what's wrong with your pleading. You're not pleading any of the things we typically see in non-compete cases or in non-solicitation cases or in reach confidentiality cases. And they didn't come back with anything. And I think that is a very challenging thing to overcome for a plaintiff when you've been given leave to file an amended complaint after the court gets a chance to rule, after we put our cards on the table and said here's what's wrong with your case. And they couldn't do it. So I think for all of those reasons, I don't agree with the supposition that, well, let's just always do discovery and always figure it out. You have to have a case to begin with. And here they really didn't. And there are other aspects that I noticed were sort of inconsistent. Mazet itself quotes Woodfield Group v. Delisle, for the established principle the determination of whether the restrictive covenant is enforceable is a question of law. That's right in their own appellate brief. So to say that the cert court was outside the boundaries of what the cert court was supposed to address, everybody agrees that the determination of the reasonableness of that provision is an unambiguous contractual provision that's not changing, no matter how many deaths you take or how much discovery you do, is a question of law. And therefore, it was properly decided in the manner it was decided. The other point I wanted to make is that some of the arguments we were seeing were almost as if reliable fire was decided under a 2615 standard or even a 2619 standard. It wasn't. It was a bench trial. Okay. So there's no discussion in there about motions to dismiss or about whether or not it's proper to evaluate on a motion to dismiss. What the court held was that, you know, you have to look at each one on its facts. The court did look at this on its facts. But that came to the conclusion, as I think any reasonable person would, which is these contractual provisions are not changing. And under these facts, you have applied either an enforceable provision or a breach of that provision. I'd also add that given all the case law, not just in Illinois but elsewhere, that really frowns upon these type of provisions. Some states say flat out, non-competes, they're simply not enforceable at all. Some make them enforceable under certain circumstances. But counsel acts like you almost get a free pass if it's a restrictive covenant case. Almost reading reliable fire, talking about the totality of the circumstances, meaning that there should be some red ink after 2615 in the code book that says except for non-compete cases in which case you get a free pass under 2615, which I don't think could ever be the case. They don't cite any case law that suggests that that would be the standard. And it's counterintuitive given that it's a question of law. The other main argument I think counsel made in the appellate brief was the And we heard it at the very end, was the supposition that if you put – if an employer sneaks language into the non-compete that says that we agree this is reasonable, we acknowledge the reasonableness that that equates to saying that we're going to – You're foreclosed. Yes, that we're going to circumvent all of Illinois jurisprudence. And if you did that, then every employer would simply do that. And all of the work that all the courts have done through all these years to say here are the rules on what it can and cannot look like would be erased. And I don't think that makes a lot of sense. We do point out that Planoff does not cite a single case that even took that type of language into consideration, much less found it determinative. And so it being one of their lead arguments, we believe it likewise doesn't support any reversal of the shared court's opinion. We'd also point out in Section 830 of the transcript, at one point the Court asked where in your pleading, or even in any of this briefing, do you identify what Mr. Felsenthal did in violation of these provisions after he left? What customer he called upon? What confidential information he used? And I respect the candor of Planoff's counsel, but he admitted something very important, which is we are not in a position to say exactly what Mr. Felsenthal did. That's not a valid complaint then. If you don't have any good faith basis to plead the claim, then you shouldn't be in court and we shouldn't be in the lawsuit. And I do think that's why the case was dismissed at the pleading stage in the Joint 2615-2619. I'm not sure if I'm worth my time, but I'll answer any more questions that the Court has. Thank you, Mr. Wood. Was that worth my time? No. Thank you very much. If you want to use it, you can stand there. Thank you. I have a question for you. Why didn't you file a TRO? Well, the reason we didn't file a TRO is because of Justice Hutchinson's decision in the Well, I might not have been there then. Capstone Financial case, where this Court found that while you may have legitimate business interests, to meet the higher standard of a TRO, you have to be able to let something more specific. You have to meet a higher standard, and we didn't think at that point we had a higher standard. Well, in other words, you have to prove some harm that's ongoing. Yes. And also, to address one of the issues that counsel for defendants raised at the very end there, I respectfully submit that counsel is being a little too wishy-washy with the record. What Judge Wheaton asked me at that argument was, have you alleged what information Mr. Feldenfald downloaded on his laptop? And that was an earlier question Your Honor had. It was a laptop. It was not the company computer at his desk, and that's in Mr. Mazzetta's affidavit. Now I forgot the point, but the point is, it didn't relate to tell us what Mr. Feldenfald did wrong. It related to tell us what Mr. Feldenfald, where did you think what he downloaded, or more specifically, what confidential information did he take? And the response is and was that the confidential information are all of the things that I've described before, that you need in order to sell to these customers. Did he download that? Well, we don't know what he downloaded on his laptop computer, Judge. I understand. You're saying he learned this information. Right. There are two points. He learned it from us, and also he was downloading information on his laptop, as Mr. Mazzetta states in his affidavit. But he was also ordered to turn over his laptop, and I'm assuming that's the company laptop. When you spoke before, I thought you were talking about his personal laptop. Well, I believe it was his personal laptop, Your Honor, but I can't state based on the record. Well, why would he turn over his? How could he be ordered to turn over his personal laptop that he got for Christmas from his wife? Let's assume that fact. Well, at the risk of forgetting something in the record, I'm not sure where he was ordered to turn over his personal laptop. Well, no, it says when Thomas learned that Felsenthal would be working for Fortune, he asked Felsenthal to immediately turn in his cell phone, laptop, key fob, and to leave the office. Now, whose laptop was that? It was the company's laptop that he was ordered to bring in. But what he was doing, and frankly, I don't remember if this is in Mr. Mazzetta's affidavit, but what he was doing is he was e-mailing himself information. That's what we believe we'll be able to establish once we have a chance to get into the facts of the case. Well, what about counsel's argument that there was no preliminary investigation done by Mazzetta? Well, there is a preliminary investigation. We investigated all the information we had available to us and what we knew and know and have alleged in our complaint is that this is an individual who was taught confidential information, provided it by Mazzetta, given leads to customers, and carried out the business. The things that are addressed as to what he actually did as an employee of Mazzetta, and he's now going to work for a direct competitor for these products and for these services,  I can't remember the word that was used. It's not just a shot in the dark. We know that he went to work with a direct competitor, and in order to sell these customers, he has to use that information to do it because he's competing with us. We know that, and we're entitled to do discovery to get specific information and to develop those facts. But we know that's what he did. That's why they hired him away from Mazzetta. I think that, but if you just look at this agreement, and that's where we all are because that's what we have in front of us right now, he can't engage in any activity in the seafood industry anywhere in North America. Most of the cases talk about geographical restrictions, geographical confinement. Anywhere in North America, on its face, is a very big space. Well, the reason it's not that big of a space in this case is because that's where he sold. That's where Mr. Feltzenfall sold. If Mazzetta's not doing business in a geographic location in the United States, then it wouldn't apply. Mazzetta sold to customers, dealt with suppliers in these areas, and that's why that's in there. It only relates to what Mr. Feltzenfall did with the customers he did it with, so it's not broad for that reason. One other question. Is your issue more with the suppliers? I mean, certainly I know it's with the customers as well, but do I understand that there is some sort of something that you learn in this fish industry that has to do with the pricing, et cetera, from the suppliers to the purchasers? With terms, yes. With terms. Mazzetta is a very well-established player in this industry, and it has arrangements with its suppliers that we think give us a competitive advantage. And what those arrangements are, what we're permitted to do with our suppliers that we've worked for, developed, negotiated, that's information that we consider to be confidential. And so that information that you work with the suppliers makes Mazzetta attractive to the buyers. It enables Mazzetta to sell product and to beat out other companies that try to compete with Mazzetta, absolutely. Okay. May I wrap up, Your Honor? Sure. Your Honor, one thing I just have to say, and this Court's going to interpret the document as a matter of law to the extent that it can on the language of the document. The concept that when you have a provision that has this paragraph 5 that says remedies, that says, and other provisions prominently stated in this agreement that says he agrees that these are the minimum protections, to argue before this Court without any factual basis that we somehow snuck this provision in the agreement is, I submit, outrageous. People are assumed to read the contracts that they sign, particularly this fellow who's now signing his second contract. But would that remedy an invalid contract, not only in a noncompetent, but any type of contract? So if you put some saving language in there, is that going to save the contract if the contract is not legal or overgrown? It did in C.G. Caster. The Court recognized that when you have a sophisticated person who agrees to do that, he's bound by that language. And for the same reason C.G. Caster held that the defendant in that case was bound by the language, the defendant in this case is bound by that language. And, Your Honors, I would conclude simply by saying that this case is the same case as the Illinois Supreme Court ruled upon in Reliable. And in Reliable, the Supreme Court said you have to allow the parties to develop the facts. It's a fact-intensive process. We have other cases on this case on the call. Thank you for your time, Your Honor. Thank you. Have a good day. Thank both parties for their arguments today. The written decision will be issued in due course for standing reasons.